1   UNITED STATES DISTRICT COURT
2   DISTRICT OF PUERTO RICO
3
4

LUZ GONZALEZ NIEVES,

    Plaintiff,                                    Civil No. 3:13-cv-01132 (JAF)

    v.

MUNICIPALITY OF AGUADILLA, et al.,

    Defendants.

5
6   **MEMORANDUM OF OPINION AND ORDER**

7   This matter is before the court on Defendant Municipality of Aguadilla's Renewed

8   Motion for Judgment as a Matter of Law pursuant to Fed. R. Civ. P. 50(b) and, in the

9   alternative, its motion for a new trial or to alter or amend the judgment pursuant to Fed.

10   R. Civ. P. 59(a) and (e).  (Docket No. 152).  The parties have fully briefed the matter and

11   it is ripe for review.

12   **I.**

13   **PROCEDURAL HISTORY**

14   Plaintiff Luz M. Gonzalez Nieves (hereinafter, "Plaintiff") commenced this action

15   against her employer, the Municipality of Aguadilla (hereinafter, "Defendant")[1], alleging

16   discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

17   12101, *et seq.*, retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. §

18   2000e, *et seq.*, and P.R. Laws Ann. tit. 1 § 501 and  P.R. Laws Ann. tit. 29 § 194a.  The

---

[1] Plaintiff also brought claims against Carlos Mendez-Martinez, personally and as Mayor of Aguadilla, and against Nannette Guevara-Perez, personally, under the ADA, ADAA, the Rehabilitation Act and Puerto Rico Law 44 and Puerto Rico Law 44.  The court dismissed the personal capacity claims brought under the ADA, ADAA, the Rehabilitation Act and Puerto Rico Law 44 as these statutes do not provide for individual or personal liability. (Docket No. 61).  Plaintiff later voluntarily dismissed her remaining personal liability claims under Puerto Rico Law 115.  (Docket No. 66).

1   court held a jury trial March 16-20, 2015. On March 20, 2015, the jury returned a verdict

2   in favor of Plaintiff on all claims, awarding $3,000,000 in compensatory damages, which

3   doubles to $6,000,000 under Puerto Rico law.   Defendant renewed its motion for

4   judgment as a matter of law and, in the alternative, for a new trial pursuant to Fed. R.

5   Civ. P. 50(b) and 59(a).  Additionally, Defendant moved for a remittitur.

6                                         **II.**

7                                **STANDARD OF REVIEW**

8          A motion for judgment pursuant to Rule 50(b) of the Federal Rules of Civil

9   Procedure, "may be granted only if a reasonable person, on the evidence presented, could

10  not reach the conclusion that the jury reached." *Visible Systems Corp. v. Unisys Corp.*,

11  551 F.3d 65, 71 (1st Cir. 2008) (citation omitted).  The court may not "evaluate the

12  credibility of the witnesses or weigh the evidence." *Cortés–Reyes v. Salas–Quintana*, 608

13  F.3d 41, 47 (1st Cir. 2010) (citation omitted).  We must view the evidence in the light

14  most favorable to the verdict and determine whether "a rational jury could have found in

15  favor of the party that prevailed." *Id.* (quotation and citation omitted). The jury's verdict

16  may be vacated "[o]nly if the facts and inferences point so strongly and overwhelmingly

17  in favor of the movant that a reasonable jury could not have [returned the verdict] will we

18  set it aside." *Id.* (quotation marks and citation omitted).

19         We may grant Defendant's motion for a new trial "only if the verdict is against the

20  clear weight of the evidence, such that letting it stand would result in a miscarriage of

21  justice."  *Id.* (quotation marks and citation omitted).   A motion for a new trial may be

22  based on the claim that the verdict is against the weight of the evidence, that the damages

Civil No. 3:13-cv-01132 (JAF)                                                                    -3-

1   are excessive, or that the trial was not fair to the moving party, and may raise questions of

2   law arising out of the trial. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251

3   (1940).

4                                                    **III.**

5                                                   **FACTS**

6          When viewing the facts most favorable to the Plaintiff here, a rational jury could

7   have found the facts as follows.

8          Plaintiff González began working for the Defendant, Municipality of Aguadilla, as

9   an administrative officer in August 1999 at the Office of the Federal Programs and the

10  Aguadilla Municipal Police. In 2007, Defendant appointed Plaintiff to an Executive

11  Officer I at the Micro Business Program, with four merit increases in salary.  On June 30,

12  2010, the Mayor notified Plaintiff that the Micro Business Program had lost funding and

13  that she would be transferred to the Municipal Office for Emergency Management

14  ("MOEM"), located at the Luis A. Canena Márquez Stadium (the "Stadium"), effective

15  July 16, 2010. By July 7, 2010, just seven days after receipt of the transfer letter, Plaintiff

16  had met with an attorney who sent a letter to Mayor Méndez challenging the transfer to

17  MOEM, inter alia, because the conditions at the Stadium would be harmful to her health

18  as she suffered from asthma. The mayor responded to the July 7th letter, but did not

19  address Plaintiff's health concerns.  Instead, the mayor explained that Plaintiff's previous

20  experience training people at the Micro Business Program would be beneficial at MOEM

21  where she would be giving seminars and orientations to business people and the general

22  public regarding responding to natural disasters and other emergencies.

1    Plaintiff began working at the Stadium on August 16, 2010.  On August 24, 2010,

2    Plaintiff received her initial explanation of duties, which included her supervision of the

3    administrative personnel at MOEM, from her supervisor.   Ten days after Defendant

4    transferred Plaintiff to the Stadium, Plaintiff visited her physician complaining of trouble

5    breathing, chest pains, and wheezing.  The only thing that had changed for Plaintiff was

6    the location of her employment, at the Stadium she was being exposed to health hazards

7    including fumes from coworkers smoking cigarettes near the time clock outside her

8    office, cat feces, excrement from pigeons both inside the Stadium and the waste being

9    washed off the seats of the stadium and running through her office ceiling.  Over the

10   four-and-a-half years that Plaintiff worked for MOEM at the Stadium, she suffered,

11   among others ailments, substantial loss of her pulmonary function, deterioration of her

12   diabetes, toxoplasmosis from the cat feces near her work station; altered mood,

13   irritability, and Adjustment Disorder with Mixed Anxiety and Depressed Mood.

14   Over the course of her time at MOEM, Plaintiff received no fewer than nine

15   certificates from Dr. Román requesting that Plaintiff be transferred out of the Stadium for

16   health concerns.  Plaintiff provided each certificate to Defendant, the first following her

17   initial visit on August 26, 2010, along with the letter from her attorney requesting the

18   transfer for a reasonable accommodation.  At no point during the four and a half years did

19   Defendant transfer Plaintiff out of MOEM or relocate her from the Stadium. Each day,

20   Plaintiff arrived at work and sat through the day without performing any job functions

21   essential to the Executive Officer I.  Her asthmatic condition made breathing and moving

22   difficult, and the assortment of medications she required to treat the asthma affected her

Civil No. 3:13-cv-01132 (JAF)                                                   -5-

1    cognitive processes.  Combined, Plaintiff's ailments made working at the Stadium

2    difficult, if not impossible.

3          Despite Plaintiff's various and consistent complaints about the conditions at the

4    Stadium, Defendant neither cured the conditions, nor moved Plaintiff out of the Stadium.

5    Plaintiff produced evidence showing that the pigeon, cat, and bat droppings issue

6    remained even after Defendant cleaned the Stadium in 2010.  In fact, part of the problem

7    was the manner of Defendant's cleaning of the Stadium and storage of cleaning supplies.

8    Defendant used chlorine and ammonia simultaneously creating fumes that exasperated

9    the health risks of Plaintiff's already suffering pulmonary system.  When the Stadium

10   was power washed, the feces made its way through the cracks and spaces of the Stadium

11   seats, through the ceiling of the offices, and then leaked down Plaintiff's office walls.

12   Whereas any one or possibly all of these conditions may not injure a person with a

13   healthy pulmonary system, each circumstance caused more and more damage to

14   Plaintiff's body.

15         Eventually, after about four years of a stalemate, Defendant offered to transfer

16   Plaintiff out of MOEM.  Plaintiff declined the offer stating that the positions offered

17   would be a demotion.  At the same time as her denial, Plaintiff pointed out to Defendant

18   the existence of another vacant Executive Officer I position to which she would accept a

19   transfer.  Defendant did not complete the transfer at that time.

20

21                                          **IV.**

22                                    **LAW & ANALYSIS**

1  A. Judgment as a Matter of Law

2      1. Reasonable Accommodation

3      Under the ADA, employers are prohibited from discriminating "against a qualified

4  individual with a disability because of the disability of such individual in regard to job

5  application procedures, the hiring, advancement, or discharge of employees, employee

6  compensation, job training, and other terms, conditions, and privileges of employment."

7  42 U.S.C. § 12112(a).  To establish a reasonable accommodation claim under the ADA,

8  Plaintiff must show "(1) that she suffers from a disability, as defined by the ADA, (2) that

9  she is an otherwise qualified individual, meaning that she is 'nevertheless able to perform

10  the essential functions of [her] job, either with or without reasonable accommodation,'

11  and (3) that the [Defendant] knew of her disability and did not reasonably accommodate

12  it." *Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162, 1166 (1st Cir. 2002) (citations

13  omitted).

14  **<u>Plaintiff demonstrated that she is disabled within the meaning of the ADA.</u>**

15      A "disability" is defined as, inter alia, "a physical ... impairment that substantially

16  limits one or more of the major life activities of such individual." 42 U.S.C. § 12112(a). §

17  12102(2)(A). The EEOC regulations themselves define "physical impairment" as "[a]ny

18  physiological disorder, or condition ... affecting one or more of the following body

19  systems: neurological, musculoskeletal, special sense organs, respiratory (including

20  speech organs), cardiovascular, reproductive, digestive, genitourinary, immune,

21  circulatory, hemic, lymphatic, skin, and endocrine[.]" 29 C.F.R. § 1630.2(h)(1).

1    It is undisputed that Plaintiff suffers from bronchial asthma, an inflammation of

2    the bronchi by a thickening of the bronchi wall and a decrease in the lining of the bronchi

3    (the lumen), which causes the individual to struggle breathing and to have wheezes and

4    shortness of breath (dyspnea) during even light exercises such as walking.  (Docket No.

5    154-1 at p. 84:1-10.)  Moreover, the parties stipulate that "[a]sthma is a covered disability

6    under the ADA and the Rehabilitation Act." (Docket No. 127 at p. 3:17.)   Further,

7    breathing is a major life activity and Plaintiff produced evidence that her asthma

8    substantially limits her ability to breathe properly. (Docket No. 154-1 at *passim*.)

9    **Plaintiff was qualified to perform the essential functions of the job, either with or**
10   **without reasonable accommodations.**
11
12   The second element requires the Plaintiff show that she was "qualified" for the job

13   when the Defendant refused to transfer her to another department or facility. This means

14   that Plaintiff must show that she had the skill, experience, education, and other job-

15   related requirements for Executive Officer I, and could do the essential functions of the

16   job—with or without reasonable accommodation.  "[C]onsideration shall be given to the

17   employer's judgment as to what functions of a job are essential, and if an employer has

18   prepared a written description before advertising or interviewing applicants for the job,

19   this description shall be considered evidence of the essential functions of the job." 42

20   U.S.C. § 12111(8).

21   A "reasonable accommodation" includes:

22   (A) making existing facilities used by employees readily accessible to and
23        usable by individuals with disabilities; and
24

1         (B) job restructuring, part-time or modified work schedules, reassignment
2             to a vacant position, acquisition or modification of equipment or
3             devices, appropriate adjustment or modifications of examinations,
4             training materials or policies, the provision of qualified readers or
5             interpreters, and other similar accommodations for individuals with
6             disabilities.

8  42 U.S.C. § 12111(9).

9       Here, Plaintiff was employed at the level of Executive Officer I since 2007 in the

10  microbusiness program.  Her job functions included speaking at various locations to

11  people who were interested in starting up a small business and assisting the individuals

12  with the orientation for a successful start-up.  (Docket No. 154-2 at p. 3:23-4:9)  In 2010,

13  the funding ran out for the microbusiness program and Defendant reassigned Plaintiff to

14  the MOEM located at the Stadium.  As an Executive Officer I at MOEM, Plaintiff's

15  essential job functions included giving seminars and orientations to business people and

16  the public in general regarding preventative and reactive events of natural disaster or

17  other emergency situations.   Additionally, Plaintiff was to supervise up to seven

18  subordinates at MOEM.

19       There is evidentiary support for the jury's finding that Plaintiff was qualified to

20  perform the essential functions of an Executive Officer I, with or without reasonable

21  accommodation.  "An 'essential function' is a fundamental job duty of the position at

22  issue." *Kvorjak v. Maine*, 259 F.3d 48, 55 (1st Cir. 2001) (*citing Ward v. Massachusetts*

23  *Health Research Institute, Inc.*, 209 F.3d 29 (1st Cir. 2000); 29 C.F.R. § 1630.2(n)(1)).

24  "The term does not include 'marginal' tasks, but may encompass 'individual or

25  idiosyncratic characteristics' of the job[.]" *Id.* (citation omitted).

1    Plaintiff had previously performed substantially similar job functions as an

2   Executive Officer I in the microbusiness program, and, in fact, the similarity of the two

3   positions was the reason the Defendant transferred her into MOEM.  A reasonable jury

4   could find that Plaintiff was able to perform the essential job function of supervising the

5   administrative personnel at MOEM.   There is no evidence that Plaintiff **could not**

6   supervise the administrative officers at MOEM, Defendant simply pointed out that she

7   **did not**. However, a rational jury could believe the testimony from both the Plaintiff and

8   Mr. Alfonso Moline Robles that Plaintiff's supervisor actively prevented her from

9   performing her supervisory duties.   (Docket Nos. 145 at 64:25-65:19).  Plaintiff's

10  unwillingness to perform menial job duties not associated with the job duties of an

11  Executive Officer I is inconsequential. *See Kvorjak*, 259 F.3d at 55.   A reasonable jury

12  reviewing the evidence could have determined that the essential job functions of an

13  Executive Officer I differ from those of an administrative officer, and that Plaintiff was

14  able to perform all essential job functions of an Executive Officer I with or without

15  reasonable accommodation.

16    Defendant argues that Plaintiff must not only be able but also willing to perform

17  the essential job duties.  This is a red-herring.  Defendant offers no citation for the

18  requirement  that  an  individual  be  willing  to  perform  essential  functions.

19  Notwithstanding, there is evidence that Plaintiff **is** and **was** willing to perform the

20  essential functions of an Executive Officer I with the accommodation for her disability.

21  Plaintiff provided Defendant with a location of vacant Executive Officer I positions

22  where she could be transferred.  Instead, Defendant offered her locations where her job

1  functions would be that of an administrative officer.   Plaintiff was not willing to

2  essentially demote herself from an Executive Officer I to an administrative officer.

3  Accordingly, even if willingness were a factor for consideration, a rational jury could

4  find that Plaintiff was willing to perform the essential functions of an Executive Officer I.

5  **Defendant refused to provide Plaintiff with a reasonable accommodation for her**
6  **disability.**
7
8        Plaintiff claims that the Defendant discriminated against her because of her

9  disability by failing to provide a reasonable accommodation for her disability. Defendant

10 asserts that the request for the reasonable accommodation and the allegation regarding

11 discrimination under the ADA are a subterfuge to obtain a transfer to another department

12 of the Municipality and to challenge the job functions assigned to her.  Under the ADA, if

13 an employer knows that an employee has a disability and needs a reasonable

14 accommodation to perform the essential functions of her job, the employer must provide

15 a reasonable accommodation.

16        A rational jury could have found the following facts.  Prior to her transfer into

17 MOEM, Plaintiff challenged the transfer out of concern for her health due to the harmful

18 conditions at the Stadium.  Within 10 days of arriving at MOEM, Plaintiff's health began

19 deteriorating. She visited Dr. Román, showing symptoms of difficulty breathing, chest

20 pains, and wheezing. Plaintiff requested a reasonable accommodation – to be transferred

21 out of the Stadium due to the harmful effects the stadium had on her health.  Defendant

22 took steps to clean the Stadium, and denied Plaintiff's reasonable accommodation.

23 Plaintiff presented evidence that the conditions at the Stadium, including employees

1   smoking in the area outside her office, pigeon and cat excrement, and other general

2   uncleanliness, persisted despite the cleaning of the Stadium.   Moreover, as both the

3   Plaintiff and Dr. Román testified, Plaintiff's health continued to significantly deteriorate.

4   (Docket No. 154-1 at 97:12-19).   Defendant received documentation from Dr. Román on

5   at least nine separate occasions from August 2010 through February 2015, requesting that

6   Plaintiff be moved out of the Stadium due to her health condition which was exacerbated

7   by the filth of the Stadium.   Defendant failed to move Plaintiff out of MOEM.   Defendant

8   did not request that Plaintiff submit to a consultation by a physician of its choice. At no

9   point did Defendant argue that transferring plaintiff out of the Stadium would cause an

10   undue hardship on it.

11        Though this court may have decided differently than the jury, the jury

12   determination must not be overturned if there is evidence that supports the verdict.   Here,

13   a rational jury court have heard the testimony, weighed the witnesses credibility,

14   examined the exhibits, and reached a verdict in Plaintiff's favor.   Accordingly, Defendant

15   is not entitled to judgment as a matter of law on Plaintiff's reasonable accommodation

16   claim.

17            2.  Retaliation

18        The ADA prohibits retaliation against "any individual because such individual has

19   opposed any act or practice made unlawful" by the ADA. 42 U.S.C. § 12203(a).

20   "Requesting an accommodation is protected conduct for purposes of the ADA's

21   retaliation provision," *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 106 (1st

22   Cir. 2007).   Complaining of discrimination on the basis of disability is also protected

Civil No. 3:13-cv-01132 (JAF)                                                                    -12-

1    conduct under the ADA. Valle-Arce v. Puerto Rico Ports Authority, 651 F.3d 190, 198

2    (1st Cir. 2011). "To establish a claim of retaliation, a plaintiff must show that (1) she

3    engaged in protected conduct, (2) she suffered an adverse employment action, and (3)

4    there was a causal connection between the protected conduct and the adverse

5    employment action." Id. (citation omitted).

6          First, there is no dispute that Plaintiff engaged in protected conduct when she

7    requested a reasonable accommodation and when she filed her charge with the EEOC on

8    September 6, 2011.

9          Second, Plaintiff suffered adverse employment actions while at MOEM including

10   a 45 day suspension (30 days unpaid), Defendant's delay in considering her request for

11   reasonable accommodation – it took 83 days for the Defendant to respond despite the

12   regulations requiring a response within 15 days, and Defendant's failure to transfer or

13   otherwise reasonably accommodate Plaintiff over the course of four and a half years.

14         Third, Plaintiff established a causal connection between the adverse employment

15   actions and her engagement in the protected conduct. Plaintiff's prima facie case is "a

16   small showing that is not onerous and is easily made." Kosereis v. Rhode Island, 331

17   F.3d 207, 213 (1st Cir. 2003) (citations and internal quotation marks omitted).

18         On January 11, 2012, Plaintiff received a letter from the mayor that indicated his

19   intent to terminate her position as an Executive Officer I as a disciplinary measure for

20   acts that occurred in 2011.  In February, 2011, Plaintiff had a nervous breakdown "[d]ue

21   to a situation of pressure and mockery by two employees by the Department of

22   Recreation -- Sports and Recreation[.]"   Despite an investigation into the incident,

1   Plaintiff was never interviewed regarding her version, nor was she disciplined prior to

2   January 2012 for the February 2011 event.

3          The second event which led to Plaintiff's suspension took place in September

4   2011.  The Stadium lost electricity causing Plaintiff's office to lose power to her air

5   conditioning unit.  Plaintiff's office did not have a window and essentially became an

6   oven.  She and another worker at the Stadium moved their chairs out of their offices into

7   the hallway in order to get breathable air.  After two days of sitting in the hallway,

8   Plaintiff requested that her supervisor reach out to the administration to find out what

9   could be done about the situation as the heat was exacerbating her bronchial asthma.

10  According to Plaintiff, her supervisor then turned to her in a hostile manner and told her

11  that she was obligated to stay at the Stadium under the extreme conditions and that if she

12  could not handle it she should just punch out and leave. Plaintiff found his comment very

13  disrespectful due to both the tone and the fact that he delivered it in front of four co-

14  workers.  Plaintiff then left the office in tears.  Defendant conducted an investigation by

15  interviewing the four co-workers who witnessed the event but did not speak with

16  Plaintiff. The report of the investigation found no fraud or deceit and recommended

17  suspending Plaintiff for a minimum of 30 days.

18         After carefully examining the record, we believe there is ample evidence of a

19  "pattern of antagonism" from which a jury could find a causal connection between

20  Defendant's adverse employment actions against Plaintiff and Plaintiff's engagement in

21  protected conduct.

1    Once a prima facie case has been presented, an inference of discrimination arises.

2    *See Hazel v. United States Postmaster Gen.*, 7 F.3d 1, 3 (1st Cir. 1993). The burden then

3    shifts to the employer to offer a non-discriminatory reason for the adverse employment

4    action. *Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 44 (1st Cir. 2002) (citation

5    omitted). In this case, the Defendant claims that it: 1) failed to respond to Plaintiff's

6    reasonable accommodation request within 15 days because Plaintiff involved a lawyer; 2)

7    suspended Plaintiff as a disciplinary measure; and 3) did not transfer Plaintiff out of

8    MOEM because the issues she complained of had been resolved and her continued

9    requests were merely subterfuge to facilitate a relocation.

10    When the employer offers a non-discriminatory reason for the adverse action, the

11    inference of discrimination fades away. *Id.* at 45. The burden then shifts back to the

12    plaintiff to show that the adverse employment action was the result of discriminatory

13    animus. *Id.* Evidence that the employer's stated reasons are pretextual can be sufficient

14    for a jury to infer discriminatory animus. *See Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 69

15    (1st Cir. 2002). One way to demonstrate pretext is "by showing that the employer's

16    proffered explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Prods.,*

17    *Inc.*, 530 U.S. 133, 143 (2000) (citation and quotation marks omitted).

18    Here, Plaintiff presented photographic evidence along with testimony that the

19    conditions present at the Stadium had not changed despite the Defendant's claim that the

20    Stadium had been cleaned. The testimony revealed that workers continued to smoke by

21    the time clock near Plaintiff's office.

1    The medical certifications provided by Plaintiff's physician state on-going and

2    even worsening health problems over the course of the four and a half years at MOEM;

3    Plaintiff provided these certificates to Defendant in the hopes that Defendant would

4    follow the physician's recommendation and transfer Plaintiff out of the Stadium and

5    away from the health risks. Defendant could have requested that Plaintiff's condition be

6    examined by a physician of their choice if it truly believed that Plaintiff was malingering.

7    Instead, we are left with the only evidence before us showing that Plaintiff's condition

8    continued to worsen while she was employed at the Stadium.

9    Plaintiff's involvement of a lawyer did not stay Defendant's duty to investigate,

10   consider, and advise Plaintiff of the outcome of her reasonable accommodation complaint

11   within 15 day time frame under the regulations.  Even if we would believe that the

12   involvement of lawyers extends the time allowed, either by practice or necessity, there is

13   no explanation for why it took Defendant 83 days to deny Plaintiff's request – especially

14   given that Defendant had cleaned the Stadium (an act which it argues took care of

15   Plaintiff's cleanliness complaint) within weeks of Plaintiff's reasonable accommodation

16   request.  There is simply no cognizable foundation for Defendant's excuse for failing to

17   address Plaintiff's reasonable accommodation request for 83 days.

18   Finally, Plaintiff demonstrated that the stated reason for her suspension was

19   pretextual. A rational jury could have found that the investigations were only performed

20   in order to paper Plaintiff's file. The sanction of termination indicated in the mayor's

21   letter of intent is severely disproportionate to the alleged wrongful act.  The letter of

22   intent to terminate included both events from 2011, one of which occurred nearly a year

Civil No. 3:13-cv-01132 (JAF)                                                    -16-

1    prior and for which no reprimand had been given at the time.  Having heard all of the

2    evidence presented at trial, the court feels that a rational jury could have found that

3    Defendant's disciplinary measures were merely pretext for its continued discrimination of

4    Plaintiff for requesting a reasonable accommodation.   The evidence demonstrates a

5    consistent deliberate indifference to Plaintiff's health concerns.

6          Accordingly, there is evidence from which a rational jury could determine that

7    Defendant's proffered reasons for its adverse actions were merely pretext, and Defendant

8    is not entitled to judgment as a matter of law on Plaintiff's retaliation claim.

9    B.  Motion for New Trial & Remittitur

10         "A new trial is warranted only if the verdict, though rationally based on the

11   evidence, was so clearly against the weight of the evidence as to amount to a manifest

12   miscarriage of justice."  *Bogosian v. Mercedes–Benz of North America*, 104 F.3d 472,

13   482 (1st Cir. 1997) (citations and internal quotation marks omitted).  A trial court must

14   exercise its discretion in favor of granting a new trial very sparingly, since "a jury's

15   verdict on the facts should only be overturned in the most compelling circumstances."

16   *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 811 (1st Cir.

17   1988).   Since the jurors are the ultimate triers of fact, "the trial court is especially

18   reluctant to order a new trial when the verdict rendered rested upon the jury's

19   determination of the credibility of witnesses".  *Raybourn v. San Juan Marriott Resort and*

20   *Stellaris Casino*, 259 F.Supp.2d 110, 112 (D.P.R. 2003) (*citing Ríos v. Empresas Líneas*

21   *Marítimas Argentinas*, 575 F.2d 986, 990 (1st Cir. 1978)).  Therefore, where the jury

22   verdict is reasonably based on the evidence presented at trial, the court may not upset the

1   verdict merely because he or she might have decided the case differently. *Velázquez v.*

2   *Figueroa–Gómez*, 996 F.2d 425, 428 (1st Cir. 1993).

3          Generally, a jury's verdict should not be disturbed unless it is "grossly excessive,"

4   "inordinate," "shocking to the conscience of the court," or "so high that it would be a

5   denial of justice to permit it to stand." *Segal v. Gilbert Color Sys., Inc.*, 746 F.2d 78, 80–

6   81, (1st Cir. 1984) (*quoting McDonald v. Federal Laboratories*, 724 F.2d 243, 246 (1st

7   Cir. 1984)).  A jury's award should only be reversed if it is "so grossly disproportionate

8   to any injury established by the evidence as to be unconscionable as a matter of law."

9   *Koster v. TWA*, 181 F.3d 24, 34 (1st Cir. 1999). A remittitur is appropriate "only when

10  the award exceeds any rational appraisal or estimate of the damages that could be based

11  upon the evidence before it." *Trainor v. HEI Hospitality, LLC*, 699 F.3d 19, 29 (1st Cir.

12  2012) (*quoting Wortley v. Camplin*, 333 F.3d 284, 297 (1st Cir. 2003)). When a court

13  decides that a remittitur is warranted, the verdict winner will be allowed the option of

14  either accepting the reduced amount or a new trial. *Liberty Mutual Insurance Company v.*

15  *Continental Casualty Company*, 771 F.2d 579, 588 (1st Cir. 1985).

16         Here, the jury award is split into two parts: Part 1 is $1,500,000 to compensate

17  Plaintiff's physical damages and/or deterioration of her health condition as a result of

18  Defendant's discrimination and/or retaliation; and Part 2 is $1,500,000 to compensate

19  Plaintiff's mental pain and anguish.  The jury award was then doubled under Puerto Rico

20  law.

21         The jury's verdict "shocks the conscience of the court" and far exceeds any

22  rational amount based on the evidence presented at trial.   Plaintiff and Dr. Román

Civil No. 3:13-cv-01132 (JAF)                                                      -18-

1   testified regarding the physical damage and emotional pain and suffering that Plaintiff

2   experienced during her time at MOEM.  Dr. Román detailed Plaintiff's lung deterioration

3   and physiological symptoms resulting from her time at MOEM.  Plaintiff herself testified

4   about her fear of dying from an asthma attack, the side effects of all the medications she

5   requires because of the conditions at the Stadium, and the emotional hardship she went

6   through for four and a half years wanting to perform the job duties of an Executive

7   Officer I, but being unable to do so.

8          Despite this testimony, the $6 Million verdict is more than "extremely generous,"

9   it is grossly excessive. Plaintiff produced no evidence of her medical expenses; in fact,

10  the evidence shows that she does not have any medical expenses. There is no evidence

11  that Plaintiff ever sought psychiatric or psychological treatment for her alleged

12  depression.[2]   Despite not performing any job functions while at MOEM, with the

13  exception of her 30 day suspension, Plaintiff received a paycheck at the salary

14  commensurate with an Executive Officer I.

15         Plaintiff is able to work in a location other than the Stadium.  There was no

16  testimony that Plaintiff's health would continue to deteriorate once she was removed

17  from the Stadium.  In fact, Dr. Román stated that if Plaintiff stayed, eventually her

18  condition would become irreversible, but that typically, the health problems associated

19  with bronchial asthma are temporary and abate once the conditions creating them no

20  longer exist.  Such is the case here.  Plaintiff no longer works at the Stadium; she has

---

[2]  "Although testimony from a mental health expert is not required to sustain an award for emotional distress, the absence of such evidence is useful in comparing the injury to the award of damages." *Koster*, 181 F.3d at 35.

1    been transferred as an Executive Officer I to the Office of Elderly Affairs, effective

2    March 24, 2015.

3         Having determined that the jury's verdict cannot stand, the court turns now to

4    determine the appropriate amount.  Under the "maximum recovery rule," the court directs

5    a remittitur geared to the maximum recovery for which there is evidentiary support.

6    *Koster*, 181 F.3d at 36.  In making its decision, this court remains "mindful that

7    translating legal damage into money damages—especially in cases which involve few

8    significant items of measurable economic loss—is a matter peculiarly within a jury's

9    ken." *Trainor*, 699 F.3d at 32 (internal quotation marks omitted) (*citing Sanchez v. P.R.*

10   *Oil Co*., 37 F.3d 712, 723 (1st Cir. 1994)). Though the evidence presented at trial dictates

11   the amount of remittitur, examination of other cases is useful in reaching a decision. *See*

12   *Koster*, 181 F.3d at 36.  In *Koster*, the First Circuit concluded that an emotional distress

13   award of $716,000 was excessive and that the evidence would support a maximum

14   recovery of $250,000.  *Id*.  There, "[t]here was no evidence that Koster ever sought

15   medical treatment or suffered any long-term depression or incapacitation" and opened a

16   business of his own after losing his job.  *Id*.  Additionally, the Court recognized that

17   Koster could have remained with his employer, "albeit in a different job with a reduced

18   salary." *Id.*

19        In *Aponte-Rivera v. DHL Solutions (USA), Inc.*, the First Circuit upheld the district

20   court's decision to remit the jury award from $350,000 to $200,000 for emotional distress

21   where the plaintiff "did not introduce any testimony by a medical expert, presented no

22   notable evidence of outward manifestations of emotional distress, and presented no

1   evidence of long term depression or medical treatment." 650 F.3d 803, 811 (1st Cir.

2   2011).  In *Sanchez*, the circuit upheld a district court's reduction from $150,000 to

3   $37,000 for emotional distress where the plaintiff testified he was humiliated losing his

4   job and having to file bankruptcy but produced no medical or psychiatric testimony

5   regarding same.  37 F.3d at 724.  As explained in *Aponte-Rivera*,

> 6    We have also upheld damages awards where the plaintiff did not seek
> 7    medical treatment or have long-term physical symptoms. *See McDonough*
> 8    *v. City of Quincy*, 452 F.3d 8, 22 (1st Cir. 2006) (upholding award of
> 9    $300,000 in Title VII retaliation case, where "the bulk" of the award was
> 10   for emotional distress in the form of humiliation and damage to reputation
> 11   and family relationships); *Rodriguez–Torres*, 399 F.3d at 64 (affirming a
> 12   $250,000 emotional distress award where plaintiff testified that
> 13   employment discrimination caused her marriage to suffer and made her
> 14   depressed); *Koster*, 181 F.3d at 35–36 (upholding $250,000 award where
> 15   plaintiff testified that employer's conduct caused him to suffer anxiety and
> 16   insomnia and damaged his family life).

18  650 F.3d at 811.

19          Having presided over the trial and observed the Plaintiff and the other witnesses

20  first hand, this court "is in the best position to assess the evidence and set an amount for

21  remittitur."  *Anthony v. G.M.D. Airline Services, Inc.*, 17 F.3d 490, 496 (1st Cir. 1994).

22  Without impinging on the function of the jury, the court states that there were many

23  issues of Plaintiff's credibility that do not appear in the black and white of a trial

24  transcript but were apparent to this experienced judge who had the opportunity to

25  personally observe tone and body language.  Among those perceptions was Plaintiff's

26  litigious nature from her initial receipt of the transfer letter in June of 2010, her

27  unwillingness to compromise, her relentless defiance, and the undercurrent from day one

28  that she simply did not want to be relocated at the Stadium and was dead set on obtaining

1    a transfer no matter what the cost.     There is no better example of this mindset than

2    Plaintiff's unwillingness to accept a transfer – primarily on principle – in the face of her

3    assertion that she was daily subjected to life threatening conditions.  Plaintiff argues that

4    the positions offered to her were for a position inferior to that of an Executive Officer I –

5    but with the same salary as the Executive Officer I position. Even accepting that as true,

6    the court must consider the fact that Plaintiff refused to remove herself from an area that

7    was allegedly so harmful to her health that she feared death.  *See Koster*, 181 F. 3d at 36.

8    While not dispositive with respect to her credibility, the fact that Plaintiff could assert

9    life-threatening conditions yet decline a transfer is certainly suggestive of exaggerated

10   damages.

11           After a careful review of the record and analogous cases, the court hereby reduces

12   Plaintiff's award for damages to One Hundred Fifty Thousand Dollars ($150,000.00), to

13   compensate Plaintiff for her physical damages and/or deterioration of her health

14   condition, and One Hundred Fifty Thousand Dollars ($150,000.00) to compensate

15   Plaintiff for her mental pain and anguish.  The $300,000 award, if accepted by Plaintiff,

16   is then doubled to $600,000.00 under Puerto Rico law.  If Plaintiff refuses to remit to

17   $600,000.000, a new trial will be held on all issues. A new trial on all issues is warranted

18   on the grounds that failing to do so would constitute an injustice because the jury's

19   verdict against Defendant of $3,000,000.00 (which was doubled under Puerto Rico law)

20   was not supported by legally sufficient evidence at trial.  Moreover, given the nature of

21   the claims raised by Plaintiff, her damage claims are so intertwined with her underlying

1  claims regarding liability that a retrial on solely damages would result in juror confusion

2  too substantial to overcome with instructions and caveats from the court.

3                                        **V.**

4                                  **CONCLUSION**

5          Defendant's motion for judgment notwithstanding the verdict is DENIED.

6  Defendant's motion for new trial is GRANTED, conditioned upon the refusal of Plaintiff

7  Gonzalez to remit $5,400,000. If Plaintiff agrees within thirty days of the date of this

8  order to remit this sum, Defendant's motion for new trial shall be denied. If Plaintiff

9  refuses within the specified time to remit the sum noted above, Defendant's motion for

10  new trial will be granted.

11      **IT IS SO ORDERED.**

12      San Juan, Puerto Rico, this 26th day of June, 2015.

13                                         S/José Antonio Fusté
14                                         JOSE ANTONIO FUSTE
15                                         U. S. DISTRICT JUDGE